IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| _____ )<br>FADIL DELKIC, )<br>       )<br>       Plaintiff, )<br>       )<br>       vs. )<br>       )<br>VLADIMIR DJURDJEV, )<br>Individually and/or d/b/a )<br>UNITED CARGO, INC., or d/b/a )<br>MARUNTEL TRUCKING, INC., or )<br>d/b/a UNITED 2 LOGISTICS, )<br>INC., and/or d/b/a JOHN DOE )<br>COMPANY and/or JOHN DOE )<br>CORPORATION, AND )<br>BOJAN ("BOB") PANIC, )<br>Individually and/or d/b/a )<br>UNITED CARGO, INC., or d/b/a )<br>MARUNTEL TRUCKING, INC., or )<br>d/b/a UNITED 2 LOGISTICS, )<br>INC., and/or d/b/a JOHN DOE )<br>COMPANY and/or JOHN DOE )<br>CORPORATION, )<br>       )<br>       Defendants. )<br>_____ ) | CIVIL ACTION FILE<br><br>NO.:  1:07-cv-1864-BBM<br><br>*Hon Beverly B. Martin, Presiding*<br><br><br><br><br><br><br><br><br><br><br><br>*AMENDED COMPLAINT and*<br><br>*JURY TRIAL DEMAND* |

<u>VERIFIED AMENDED COMPLAINT AND JURY DEMAND ("AMENDED COMPLAINT")</u>

Plaintiff hereby timely files his *Amended Complaint and Jury Demand* as ordered by this Court and shows this Court as follows:

*JURISDICTION*

1.     Jurisdiction over Plaintiff's federal claims is proper in this Court, in part, pursuant to 28 U.S.C.A. §§ 1331 and 1341 (a)(3) and as there is diversity in citizenship of Plaintiff and all Defendants and the amount in controversy

*Page 1 of  35*

exceeds this Court's $75,000.00 diversity subject matter jurisdictional requirements which trigger this Court's subject matter jurisdiction.

2.    Under, in part, 28 U.S.C.A. § 1367, this Court also has pendant and supplemental jurisdiction over Plaintiff's State law claims as, in part, Plaintiff's federal and State law claims arise out of a common nucleus of operative facts.

*VENUE*

<u>Initial Remarks</u>:

Plaintiff's Affidavit, Verification and Certification is attached hereto and incorporated by reference herein.

At all times relevant hereto, a broker used by Plaintiff, Turbo Logistics-Expedite (Tim, contact person) ("Turbo") cancelled one/some of Defendants' loads form/out-of Georgia because they were checking Defendants' insurance and DOT number(s) and determined that Defendants' may have forged and/or altered and/or misrepresented same to said broker (and/or the DOT) because the insurance and DOT number(s) did not match up. Plaintiff was forced to "miss" that load, loss loading-time and had to get another broker with "real" insurance and DOT number(s) and Defendants found Plaintiff another load where documents were not checked upon information and belief. This incident (in December, 2004), and others like it, was the main reason that Turbo refused to broker any more loads for Defendants (Turbo did

everything by the book and had too many questions about Defendants' paperwork, alleged insurance coverage and DOT number(s) for their trucks.

Plaintiff has chosen this venue for his claims against these Defendants, in part, as is his right, and, more specifically, because he, by law, has that right especially under the federal *Diversity* provisions and the facts surrounding his claims against these Defendants' for their illicit and/or illegal acts and omissions directed at him, the Defendants' contacts with Georgia (using and benefitting from the laws of Georgia and benefitting from the protections afforded to them by said laws), as also provided, in part, by the Georgia Long-Arm Statute[1] and because

---

[1] Under, in part, the Georgia *Long arm Statute* personal jurisdiction of these Defendants is proper:

A court of this state may exercise personal jurisdiction over any nonresident ..., as to a cause of action arising from any of the acts, omissions ... enumerated in this Code section, in the same manner as if he were a resident of the state, if in person or through an agent, he:

(1) Transacts any business within this state; [or]

(2) Commits a tortious act or omission within this state; ... [or]

(3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state; ...

(Emphasis Supplied) O.C.G.A. § 9-10-91.

of Defendants' tortuous acts directed at Plaintiff, a Georgia
resident and the 48 incidents of "entry into Georgia" by
Defendants, as brokers for subject loads outlined in Plaintiff's
attached and incorporated Affidavit (verification) to further
their criminal and/or tortuous fraud, their schemes, their
illicit and/or illegal activities and omissions, their
racketeering activities and enterprise (Defendants under, in
part, Georgia RICO, are an enterprise and should be consider as
such by this Court and their predicate acts against Plaintiff and
their own insurer, Cannell Insurance, is evidence of their
nefarious schemes to defraud and injure Plaintiff and others and
is a pattern of racketeering activity spanning many, many years).

3.    Venue is proper in this Court, in part, as indicated in the
      *Initial Remarks* above, as sworn to by Plaintiff in his
      attached and incorporated Affidavit (and verification), as
      indicated in Plaintiff's Response to Defendants' *Motion and
      Request* (which is incorporated by reference herein) and, at
      all times relevant hereto, Plaintiff resided (and still
      resides) and his business location was (and still is) within
      this Court's judicial district and within the physical
      boundaries of the Atlanta Division thereof (note: at all
      times relevant hereto, Plaintiff works, and still works, out
      of his home in Snellville, Georgia when not on the road
      delivering or picking up loads). Thus, venue is proper in

this Court and this case should remain with this Court.

*PARTIES*

4.  Plaintiff is a resident of this Court's judicial district and within the physical boundaries of the Atlanta Division thereof and has been same at all times relevant hereto until the present time.

5.  Joint-Tortfeasor and Defendant VLADIMIR DJURDJEV ("Djurdjev") is a citizen of the State of Illinois and may be served with Summons and Complaint at his Illinois residence, to wit: 1613 Highridge Parkway, Westchester, Illinois, 60154 and/or his business address, to wit:  United 2 Logistics, Inc., located at 2238 Landmeier Road, Elk Grove Village, Illinois, 60007.

6.  According to admissions against interest by Defendant(s), at all times relevant hereto, Djurdjev was the alter ego of Joint-Tortfeasor and Defendant UNITED CARGO, INC., which owned and operated the trucking companies called Vladimir Djurdjev and Bojan Panic, upon information and belief, owned and operated same but a/k/a United Cargo/Maruntel Trucking (hereinafter, collectively, referred to as "United").

7.  According to admissions against interest by Defendant(s), at all times relevant hereto, Djurdjev was the alter ego of Joint-Tortfeasor and Defendant MARUNTEL TRUCKING, INC., which owned and operated a trucking company called Corneliu

Maruntel or visa-versa and, upon information and belief, a/k/a United Cargo/Maruntel Trucking hereinafter, collectively, referred to as "Maruntel").

8. According to admissions against interest by Defendant(s), at all times relevant hereto, Djurdjev is/was the alter ego of Joint-Tortfeasor and Defendant UNITED 2 LOGISTICS, INC. (hereinafter, collectively, referred to as "United 2").

9. According to admissions against interest by Defendant(s), at all times relevant hereto, Djurdjev was the alter ego of Joint-Tortfeasors and Defendants John Doe Company and John Doe Corporation (hereinafter, collectively, referred to as "John Doe Corporation/Company").

10. Joint-Tortfeasor and Defendant BOJAN ("BOB") PANIC ("Panic") is a citizen of the State of Illinois and may be served with Summons and Complaint at his Illinois place of business, to wit: United 2 Logistics, Inc., 2238 Landmeier Road, Elk Grove Village, Illinois, 60007.

11. According to admissions against interest by Defendant(s), at all times relevant hereto, Panic was the alter ego of United.

12. According to admissions against interest by Defendant(s), at all times relevant hereto, Panic was the alter ego of Maruntel *albeit* Djurdjev was signing "payroll" checks from United Cargo to pay some of the Maruntel drivers-at least

for most of Plaintiff's payments.

13. According to admissions against interest by Defendant(s), at all times relevant hereto, Panic is/was the alter ego of United 2.

14. According to admissions against interest by Defendant(s), at all times relevant hereto, Panic was the alter ego of John Doe Corporation/Company.

*PRELIMINARY REMARKS AND ALLEGATIONS*

All previous paragraphs are incorporated herein-below:

15. Upon information and belief, the assets and/or property of United and Maruntel ("company assets")were transferred to and/or converted by Djurdjev and Panic for their own use and enjoyment ("personal assets") and to hide said Company and personal assets in order to further their enterprises, schemes and/or illicit and/or illegal acts and omissions (hereinafter, collectively, "egregious acts").

16. Upon information and belief Maruntel was/is the successor in fact and law of United and all of United's assets and liabilities passed to Maruntel, Djurdjev and Panic; upon information and belief, United 2 was/is the successor in fact and law of Maruntel and all of Maruntel's assets and liabilities passed to United 2, Djurdjev and Panic; upon information and belief John Doe was/is the successor in fact and law of United 2 and all of United 2's assets and

liabilities passed to John Doe, Djurdjev and Panic.

17. Djurdjev and Panic pretended to be former Serbian "concentration/death-camp" officials[2] when they dealt with their Bosnian workers(non-Serbian workers and/or those of Bosnian decent).

18. Plaintiff was Bosnian, and was held and tortured in such a camp (Logor, et al.) for approximately 230 days, about eight (8) months, or so,[3] the words used, the "pretending" actions of Defendants opened those old wounds and had the desired effect on Plaintiff and the other Bosnian/non-Serbian workers, and Plaintiff was "forced" to relive those nightmares each time the Defendants, individually or together, "gleefully" and maliciously acted out their death camp routine(s) purposefully and knowingly directed at and unquestionably against non-Serbians like Plaintiff and used to create fear and absolute obedience to their

---

[2] Djurdjev and Panic were acting in their office(s) as if they were Serbian Concentration and/or death camp officials by mirroring the posturing and voice inflections of those evil entities in the same way Plaintiff, and others, remembered. In their office(s) they had a cafeteria where they "served" food and drinks. There was only one table in there and Defendants, at all times relevant hereto, had a long "silver" soldier's knife on that table (no one could remove it or touch it except Defendants). The knife had "genocide" and "ethnic cleansing" significance as it was an actual, or very close replica, of the knives used in the death camps to kill and torture non-Serbians in death camps; *i.e.,* Logor, in which Plaintiff was imprisoned an tortured and he saw those atrocities.

[3] Plaintiff still has the papers attesting to his imprisonment in those death camps, to wit: for *Logor*, *Omarska*, *Manjaca* and *Batkoviciof*; all of which Defendants were well-aware.

wishes/orders[4].

19.  At the time of his first encounter with Djurdjev and/or
     Panic, Plaintiff had only been in the United States for
     about 18 months on a work visa.

*FACTUAL ALLEGATIONS AND SOME FUNDAMENTAL BASES FOR CLAIMS*

     All previous paragraphs are incorporated herein-below:

Preamble to Claims:

     As Plaintiff is no longer employed by Defendants and as
Defendants have exclusive possession, custody and/or control of
much of the information and/or documents to support the following
claims against Defendants, each paragraph, when relating to or
concerning information held by Defendants, shall be prefixed by
the phrase "upon information and belief" reasonably relying upon
those "other" sources as described herein whether or not
specifically enumerated as such herein-below.

Generalized Fraud Claims:

     Under the criminal activity exceptions found for the

---

[4]  As one example of this, Plaintiff offers the following: one day, when Plaintiff walked into Defendants' offices to find a load assignment for himself, Defendant Djurdjev strutted out of his private office and, in a loud, closely-mimicked "death camp official voice," he said, "where is my Milan Martic? Find Milan Martic, I need him." Then, everyone in the office started to laugh at Plaintiff (he was the only non-Serbian present in Defendants' offices at that time). To understand the horror and intimidating power these seeming innocuous statements by Defendant had, one must understand that Milan Martic was once the leader of the Serbs in Croatia (Knin), he is now serving, at last account, 35 years in jail for his war crimes. Milan Martic lead Serbia in its ethnic cleansing–killing, death camp interments and torturing--of many Croatians, Muslims and other non-Serbians (circa 1990) and the terror that name induces is akin to using the name of Hitler, et al., to the Jewish holocaust survivors/victims: Plaintiff was again abused and terrorized.

Intracorporation Conspiracy Doctrine in decisions relating to and concerning, in part, federal and Georgia RICO("RICO") by implication, Plaintiff shows that the subject and alleged corporations fall under those rulings and, as said corporations are merely the alter egos of Defendants Djurdjev and Panic, these two Defendants are, in fact, the corporations and visa versa.

Each of the following paragraphs are to be viewed in the light of Defendants' herein-below enumerated racketeering, nefarious, fraudulent and criminal activities in furtherance of its illicit and illegal schemes to deny said policy claims throughout this matter ("egregious acts"), from the hiring, paying, invoicing, federal and State reporting and other business transactions, and they are to be evaluated under Rule 9 in the context of and in the furtherance of those egregious acts whether or not those egregious acts are specifically enumerated therein, or not.

As show, these allegations thereby authorizing a jury to award contract and tort penalties, punitive damages, treble RICO damages, attorney's fees and costs of litigation in favor of Plaintiff. Misrepresentations by Defendants were made for the purpose of inducing Plaintiff to act thereon and he did act thereon to his injury.  Said misrepresentations were willful and knowingly false and were made by officers, employees, agents and/or co-conspirators of Defendants for the purpose of deceiving

Plaintiff and said misrepresentations were material to Plaintiff in his decision to remain employed by Defendants and to continue to make trip and cargo premium payments on said load and trailer and brokerage payments on booked deliveries and pick-ups; while unaware, at the time, of the sham of a brokering trips, premium invoicing and/or claims investigation/processing, to his injury.

Each paragraph below shall be under the rubric that Defendants intended to defraud Defendants through a pattern of misrepresentations, etc., said misrepresentations where known by Defendants to be false, Plaintiff reasonably believed and relied upon those false representations, which induced him to act to his injury as more specifically enumerated herein. Further, as the specific dates and times and persons involved in these egregious acts may not be know at present, Plaintiff will give Defendants, under in part, Rule 9, sufficient information to be put on notice of which of their specific fraudulent and egregious acts Plaintiff has ferreted out to date, despite the fact that Defendants' egregious acts were/are insidious and very secretive (as all such RICO conspiracies are) and the fact that Defendant has much, and in some cases, all of, this information in their sole possession, custody and control at this time (hopefully discovery will uncover same).

Defendants targeted Plaintiff simply because he was Bosnian, here on a work visa, spent time in a Serbian prison/death camp,

was suspicious of law enforcement and/or governments and who was brought up to fear and not question Serbian authority and to trust them 100% regardless of the cost or damage to them and not to complain when wrongfully injured.

The term "*and others*" when used here shall and does include the captioned "John Does 1 to 6" and/or <u>other</u> co-conspirators.

20. From the later part of 2003 to the end of August 2004, Plaintiff was employed as a driver for Djurdjev ("Vladimir Djurdjev" was/is also the name of the company) and Plaintiff drove Djurdjev's truck and Panic was the dispatcher for Djurdjev and Plaintiff's supervisor. Plaintiff was forced to drive said truck in pairs (he had to have another driver with him so that they would have no excuse not to drive around the clock to drop off and pick up loads). Driving times and load rates/day were strictly controlled by Defendants and any deviations from their rigid and 24X7 scheduling met with threats, harsher treatment and ridicule.

21. When Plaintiff was hired, Djurdjev informed Plaintiff that he would have to be paid by the mile driven, *e.g.*, at a rate of 36¢ times one-half of the miles driven for each load, or the equivalent of 18¢ per mile("18¢ per mile") and not an hourly wage plus 18¢ per mile as were the Serbian drivers.

22. Despite questioning Djurdjev, *and others*, about this apparent inequity, Plaintiff was told that he would have to

become an Owner-Operator to get "full mileage" credit.

23. Plaintiff later determined that Djurdjev, *and others*, had reported to the IRS and Illinois that Plaintiff (as well as other "hoodwinked" drivers, had been paid the full 36¢ per mile and they had deducted same as business costs and expenses of operating *their* trucks and employing drivers.

24. Djurdjev, *and others*, illicitly and illegally converted 18¢ per mile for each and every load Plaintiff took for them from October 2003 through August 2004 (average 5400 miles per week or approximately 237,000 miles = $42,560.00).

25. In October 2003, Plaintiff was involved in an accident in South Carolina taking a load from North Carolina to South Carolina for Djurdjev and while driving Djurdjev's truck.[5]

26. Despite having been <u>allegedly</u> insured for said accident (Plaintiff has recently found out that Defendants' defrauded their own insurer, Cannell Insurance Company, and submitted *claims* for said accident and about $250,000 was fraudulently paid out on that claim), Plaintiff was illicitly and/or illegally docked a total of $1,000.00 for said accident.

27. Djurdjev, *and others*, have never provided Plaintiff with any

---

[5] Although the truck belong to Defendant Djurdjev, it was leased to Jinnaz, Inc., which, in turn, leased it to Schneider, Inc. And the trailed was from Schneider as was the load–thus, upon information and belief, Defendants had no losses from said accident yet charged Plaintiff anyway (<u>see</u>, paragraphs 26 through 30 for additional details of Defendants' fraud and RICO activities relating to and concerning their alleged $1,000.00 loss due to the subject 2003 accident).

explanation or accounting of the two $500.00 wage deductions other than *You have to pay $1,000.00 for the accident. That is the way it is done in America; truck drivers pay for their own accidents*--to paraphrase Djurdjev (the Defendants never told Plaintiff that they never insured that truck and fraudulently charged him for same and converted his funds).

28. Having been only in the United States for a short time and not knowing "the way it is done" here, Plaintiff was forced to discontinue his efforts in obtaining a better explanation and/or an accounting of how the $1000.00 was disbursed and/or for what is was used by them.

29. Djurdjev, *and others*, illicitly and illegally converted $500.00 of Plaintiff's wages on or about 31 October 2003.

30. Djurdjev, *and others*, illicitly and illegally converted $500.00 of Plaintiff's wages on or about 7 November 2003.

31. Because he could not obtain other employment, Plaintiff continued driving Djurdjev's truck until he was able to purchase a truck and become an Owner-Operator.

32. In late August 2004, Plaintiff entered into an agreement with Djurdjev and Panic to be an Owner-Operator under their brokerage firm, United, however, during 2004 into late 2005, Maruntel and United were being combined then separated, then combined again and then they were leasing each others' equipment and altering company/corporate names, DOT and

State registrations and business locations (upon information and belief, ostensibly as part of their enterprise, schemes, predicate acts and racketeering activities to, in part, convert Plaintiff's funds, hide true ownership of the various trucking and/or booking firms (hereinafter, "trucking firms"), illicitly and/or illegally launder funds and/or transfer funds from one trucking firm to another so that Plaintiff could never access their assets and/or follow any illicit and/or illegal paper trail-they hid these facts from federal and State agencies and filed false reports with them to cover their tracks and their illegal money laundering and other racketeering activities) such that loads 1 through 47 were through, for the most part, United, loads 48 through 56 were through, for the most part, Maruntel and the remaining loads 57 through 97 were, for the most part, during the time which Defendants were evolving and switching from United to Maruntel to United/Maruntel to Maruntel/United 2; thus, for simplicity, and for time-line continuity, Plaintiff will refer to all such brokerage bookings and events as occurring through United or Maruntel (but, the terms "United" or "Maruntel" or "Defendants" herein-below shall and does include all these Defendants, individually or in concert and any *John Doe* yet uncovered).

33.  On any payment for any load picked up and delivered by

Plaintiff ("trip fee"), as owners and/or d/b/a United, Djurdjev and Panic (hereinafter, collectively, "United") charged a ten (10%) percent brokerage fee and, then in 2005, as owners and/or d/b/a Maruntel, Djurdjev and Panic (hereinafter, collectively, "Maruntel") charged an eleven (11%) percent or a twelve (12%) percent brokerage fee (the terms United and Maruntel are and shall be collectively referred to as "United" or "Defendants").

34.  This trip fee was to be determined ONLY by the company (or by a larger broker subcontracting out to United or Maruntel) requiring load pick up and delivery and United was <u>not</u> supposed to adjust said trip fee downward (*i.e.*, illicitly or illegally *skim* amounts off the top), retain the difference and obtain additional profits for United.

35.  Further, United required Plaintiff to pay into escrow an "emergency fund" totaling $1,000.00; which was deducted in four (4) equal $250.00 installments from Plaintiff's weekly earnings.

36.  Further, United required Plaintiff, as he did not own a trailer, to pay the cost of leasing a trailer for his truck ("rig") and United agreed to advance that cost.

37.  This cost was to be determined by the lessor ONLY and United was <u>not</u> supposed to add any fees or costs thereto or inflate the cost of said rental to obtain additional profits for

United.

38.  Further, as Plaintiff did not have his own insurance, United required Plaintiff to reimburse United for the actual cost of insuring Plaintiff's rig, which United advanced for said required rig insurance.

39.  This cost was to be determined by the insurer ONLY and United was not supposed to add any fees or costs thereto or inflate the cost of said rig insurance to obtain additional profits for United.

40.  Further, as Plaintiff leased the trailer for his rig and he did not have his own insurance on that trailer, United required Plaintiff to reimburse United for the actual cost of insuring Plaintiff's leased trailer, which United advanced for said required leased–trailer insurance.

41.  This cost was to be determined by the insurer ONLY and United was not supposed to add any fees or costs thereto or inflate the cost of said trailer insurance to obtain additional profits for United.

42.  Further, as Plaintiff did own the cargo he was hauling and did not have his own cargo insurance, United required Plaintiff to reimburse United for the actual cost of insuring the cargo which Plaintiff hauled and United agreed to advance said cargo insurance for Plaintiff.

43.  This cost was to be determined by the insurer ONLY and

United was not supposed to add any fees or costs thereto or inflate the cost of said cargo insurance to obtain additional profits for United.

44. As part of their agreement United debited Plaintiff's payments for fuel tax, however, this cost was to be determined by the federal and State regulation ONLY and United was not supposed to add any fees or costs thereto or inflate the cost of said fuel tax to obtain additional profits for United.

45. As part of his agreement with United, Plaintiff was to receive $35.00 per hour wait time and $0.50 per mile when he had to travel with an empty trailer for pick ups; but, when Plaintiff was required to pay for an unloader, the broker or shipper would reimburse him through United and United was not to include that amount as part of a trip fee and/or and was not to take a brokerage fee out of same and/or convert same to its own use and/or enjoyment.

46. As part of his agreement with United, Plaintiff was allowed to receive advances while on the road for fuel, repairs, rig and/or trailer maintenance, emergencies, food, lodging, or the like ("advances"), which he agreed to reimburse dollar-for-dollar out of his next check.

47. It was agreed that United would receive the trip fees directly from the shippers or through subcontracting

brokers, deduct United's 10% brokerage fees, deduct United's
payment to the insurer for Plaintiff's rig, deduct United's
payment to the insurer for the leased trailer, deduct
United's payment for the leasing of the trailer and deduct
any advances made to Plaintiff during that pay cycle or any
advances due from prior cycles.

48. Some of the aforementioned brokers during all times relevant
hereto were/are: C.H. Robinson-Chicago Central; Quebecor
World Logistics; Turbo Logistics-Expedite; Schneider
National, Inc.; Transportation Solutions Group, LLC.; Hub
City terminals, Inc.; Custom Companies, Inc.; Alert cargo
Express, inc.; DUNI Corporation c/o BAX Global Supply Chain
Management; ROC Transport, Inc.; Swan transportation
Service, LTD.; Sureway transportation Company; Volume
Transportation Service; World Logistics Group, Inc.; First
Cut Produce, Inc.; Damiron Transportation Service, Inc.;
Nationwide Transportation, Inc.; American Distribution
Service, Inc.; and, Exel Transportation Service.

49. The aforementioned trailer lessor was/is Crystal Leasing,
LLC., 7700 Brush Hill Road, Suite 222, Burr ridge, Illinois
60527 (It should be noted here that United Cargo was renting
trailers from the Crystal Company; and, before *Defendant(s)*
rented from Crystal Company *he/they/it* also rented from
Systems Transportation Equipment, Incorporated, located at

2700 Madison Avenue, Bellwood, IL 60104-2218, office phone
number: 1 (708) 547-5500.

50.  The aforementioned insurers for Plaintiff's rig, Plaintiff's
leased trailer and/or the cargo Plaintiff hauled were/are,
in part: American International Group ("AIG"), Euclid
Insurers, American Contractors Indemnity Company, Canal
Insurance Company, Illinois National Insurance Company and
Federal Insurance Company.

*MORE SPECIFIC EGREGIOUS AND ILLEGAL ACTS BY DEFENDANTS AND THEIR*
*CO-CONSPIRATORS* (for RICO predicate acts and Rule 9 "testing")

All previous paragraphs are incorporated herein-below:

(Note: All dollar amounts herein *rounded up* to nearest $1.00)

51.  August 2004 (Load #1):  No cargo insurance advanced by
United but Plaintiff charged $38.00 for same, Plaintiff
overcharged $5.00 for trailer rental and Plaintiff paid
$15.00 for fuel tax but same was never submitted for him by
United as agreed (sub total = $58.00).

52.  September 2004 (Loads #2 to #15): United skimmed $290.00
from trip fees, no cargo insurance advanced by United but
Plaintiff debited $585.00, Plaintiff overcharged $32.00 for
trailer rental, Load #8, Plaintiff drove empty for 650 mile
but never paid $325.00 fee by United and Plaintiff paid
$127.00 for fuel tax but same was never submitted for him by
United ($1,369.00; sub total= $1,427.00)

53. <u>October 2004 (Loads #16 to 30)</u>:  United skimmed $1,000.00 from trip fees, no cargo insurance advanced by United but Plaintiff debited $638.00, Plaintiff overcharged $37.00 for trailer rental, and Plaintiff paid $123.00 for fuel tax but same was never submitted by United (<u>$1,369.00</u>; sub total = <u>$2,796.00</u>)

54. <u>November 2004 (Loads #31 to 40)</u>:  United skimmed $450.00 from trip fees, no cargo insurance advanced by United but Plaintiff debited $450.00, Plaintiff overcharged $31.00 for trailer rental, and Plaintiff paid $148.00 for fuel tax but same was never submitted by United (<u>$1,080.00</u>; sub total = <u>$3,876.00</u>)

55. <u>December 2004 (Loads #41 to 47)</u>:  United skimmed $300.00 from trip fees, no cargo insurance advanced by United but Plaintiff debited $548.00, Plaintiff overcharged $32.00 for trailer rental, and Plaintiff paid $263.00 for fuel tax but same was never submitted by United (<u>$1,045.00</u>; sub total = <u>$4,921.00</u>)

56. <u>January 2005 (Loads #48 to 59)</u>:  United skimmed $475.00 from trip fees, no cargo insurance advanced by United but Plaintiff debited $450.00, Plaintiff overcharged $35.00 for trailer rental, and Plaintiff paid $90.00 for fuel tax but same was never submitted by United (<u>$1,048.00</u>; sub total = <u>$4,928.00</u>)

57.  <u>February 2005 (Loads #60 to 70)</u>:  United skimmed $50.00 from
     trip fees, no cargo insurance advanced by United but
     Plaintiff debited $660.00, Plaintiff overcharged $37.00 for
     trailer rental, and Plaintiff paid $152.00 for fuel tax but
     same was never submitted by United (<u>$899.00</u>; sub total =
     <u>$5,823.00</u>)

58.  <u>March 2005 (Loads #71 to 84)</u>:  United skimmed $200.00 from
     trip fees, no cargo insurance advanced by United but
     Plaintiff debited $600.00, Plaintiff overcharged $35.00 for
     trailer rental, and Plaintiff paid $123.00 for fuel tax but
     same was never submitted by United (<u>$958.00</u>; sub total =
     <u>$6,781.00</u>)

59.  <u>April 2005 (Loads #84 to 97)</u>:  United skimmed $150.00 from
     trip fees, no cargo insurance advanced by United but
     Plaintiff debited $440.00, Plaintiff overcharged $29.00 for
     trailer rental, and Plaintiff paid $10.00 for fuel tax but
     same was never submitted by United (<u>$629.00</u>; final *minimal*
     total = <u>$7,410.00</u>)

60.  Thus, at minimum, Defendants illicitly and illegally
     converted $7,410.00 of Plaintiff's funds by *illegally
     skimming* trip fees earned by Plaintiff, by illicitly and
     illegally charging Plaintiff for cargo insurance which they
     never had on Plaintiff's loads or which they illegally set
     themselves up as a DOT insurer and issued "policies" as such

"alternate insurer" in Illinois and for DOT, by illicitly and illegally overcharging Plaintiff for the third-party leasing of his trailer(s) and by illicitly and illegally charging Plaintiff for fuel taxes which they never paid.

61.   Further, Defendants listed miscellaneous charges on nearly every weekly *pay period invoice* while Plaintiff was an employee and/or Owner-Operator and, to this day, Defendants refuse to give Plaintiff any explanation for those charges or an accounting thereof despite repeated requests for same.

62.   The total amount of these "phantom charges" exceeds $2,500.00 plus 18% per annum interest from date of charge.

63.   These egregious acts by Defendants, individually and in concert, give rise to federal and State claims enumerated herein and/or as ferreted-out during discovery, and, to the limit provided by law, Defendants are jointly and severally liable for any and all damages arising therefrom.

64.   Defendants conspired to and did commit the herein illicit and/or illegal acts, *inter alia*, as part of their enterprise and schemes to deprive Plaintiff of his property, funds and financial resources, and other personal resources, by and through said schemes, predicate acts and nefarious and racketeering activities (see, in part, the federal and State claims enumerated below)and any and all such RICO, intentional torts and/or racketeering and nefarious schemes

and activities impacting and/or directed at Plaintiff.

<u>CLAIMS</u>

<u>Federal Claims</u>:

All previous paragraphs are incorporated herein-below:

<u>Mail Fraud</u>:

65. For the within and/or foregoing reasons and by and through subject egregious acts enumerated herein, Defendants used the mails in furtherance of their schemes, enterprise and nefarious and racketeering activities.

66. Thus, Defendants are liable to Plaintiff for all damages arising form their Mail Fraud.

<u>Wire Fraud</u>:

67. For the within and/or foregoing reasons and by and through subject egregious acts enumerated herein, Defendants used the wires in furtherance of their schemes, enterprise and nefarious and racketeering activities.

68. Thus, Defendants are liable to Plaintiff for all damages arising form their Wire Fraud.

<u>Conspiracy</u>:

69. For the within and/or foregoing reasons and by and through subject egregious acts enumerated herein, Defendants used various conspiracies in furtherance of their schemes, enterprise and nefarious and racketeering activities.

70. Thus, Defendants are liable to Plaintiff for all damages

arising form their conspiracies, individually or in concert.

False Swearing:

71.   For the within and/or foregoing reasons and by and through
      subject egregious acts enumerated herein, Defendants used
      false swearings, bogus reports, fraudulent filings with
      State and federal agencies and the wires in furtherance of
      their schemes, enterprise and nefarious and racketeering
      activities.

72.   Thus, Defendants are liable to Plaintiff for all damages
      arising form their false swearings.

Extortion:

73.   For the within and/or foregoing reasons and by and through
      subject egregious acts enumerated herein, Defendants used
      extortion in furtherance of their schemes, enterprise and
      nefarious and racketeering activities.

74.   Thus, Defendants are liable to Plaintiff for all damages
      arising form their extortion activities towards Plaintiff.

Federal RICO Act:

75.   For the within and/or foregoing reasons, the subject
      egregious predicate acts enumerated herein evidence
      Defendants use of same in furtherance of their schemes,
      enterprise and nefarious and racketeering activities; all of
      which are predicate acts as defined by the federal RICO Act.

76.   Thus, Defendants are liable to Plaintiff for treble damages,

Punitive damages, attorney fees and costs of litigation and all such like damages arising from such activities and/or all such nefarious schemes and activities directed at Plaintiff.

State Claims:

All previous paragraphs are incorporated herein-below:

Georgia RICO Act:

77. For the within and/or foregoing reasons, the subject egregious predicate acts enumerated herein evidence Defendants use of same in furtherance of their schemes, enterprise and nefarious and racketeering activities; all of which are predicate acts as defined by the Georgia RICO Act.

78. Thus, Defendants are liable to Plaintiff for treble damages, Punitive damages, attorney fees and costs of litigation and all such like damages arising from such racketeering and criminal activities or arising from all such nefarious schemes and activities directed at or impacting Plaintiff.

79. Under Georgia law, the proof of any RICO claims is by a preponderance of evidence.

Theft by Conversion:

80. For the within and/or foregoing reasons, the subject egregious predicate acts, such as theft by conversion, enumerated herein, evidence Defendants use of same in furtherance of their schemes, enterprise and nefarious and

racketeering activities; all of which are predicate acts as
defined by RICO and/or are torts under Georgia law.

81.   Thus, Defendants are liable to Plaintiff for all damages
arising from such theft activities and/or all such nefarious
schemes and activities directed at Plaintiff.

<u>Theft by Deception</u>:

82.   For the within and/or foregoing reasons, the subject
egregious predicate, acts such as theft by deception,
enumerated herein, evidence Defendants' use of same in
furtherance of their schemes, enterprise and nefarious and
racketeering activities; all of which are predicate acts as
defined by RICO and/or are torts under Georgia law.

83.   Thus, Defendants are liable to Plaintiff for all damages
arising from such activities and/or all such nefarious
schemes and activities directed at Plaintiff.

<u>Fraud</u>:

84.   For the within and/or foregoing reasons (<u>see</u>, in part,
specific acts and dates listed above) the subject egregious
predicate acts, such as criminal, statutory and common law
fraud enumerated herein, evidence Defendants use of same in
furtherance of their schemes, enterprise and nefarious and
racketeering activities; all of which may be predicate acts
as defined by RICO Act and/or are tort under Georgia law.

85.   Thus, Defendants are liable to Plaintiff for all damages

arising from such fraudulent activities and/or all such nefarious schemes and activities directed at Plaintiff.

Breach of Contract and/or Breach of Fiduciary Duty:

86. For the within and/or foregoing reasons, the subject egregious predicate acts, tortuous breach of contract and/or breach of fiduciary duties enumerated herein, evidence Defendants use of same in furtherance of their schemes, enterprise and nefarious and racketeering activities; all of which may be predicate acts as defined by RICO and/or are intentional torts and/or negligent torts under Geogia law.

87. Thus, Defendants are liable to Plaintiff for all damages arising from such activities and/or directed at Plaintiff.

Conspiracy:

88. For the within and/or foregoing reasons, the subject egregious predicate acts, conspiracy, individually or in concert with other Defendant(s) or John Does enumerated herein, evidence Defendants use of same in furtherance of their schemes, enterprise and nefarious and racketeering activities; all of which are predicate acts as defined by RICO and/or are torts under Georgia law.

89. Thus, Defendants are liable to Plaintiff for, *i.e.*, treble RICO damages arising from such activities and/or all such nefarious schemes and activities directed at Plaintiff.

False Swearings:

90. For the within and/or foregoing reasons, the subject egregious predicate acts, false swearings as enumerated herein, evidence Defendants use of same in furtherance of their schemes, enterprise and nefarious and racketeering activities; all of which are predicate acts as defined by RICO and/or are torts under Georgia law.

91. Thus, Defendants, individually and severally, to the extent allowed by law, are liable to Plaintiff for all damages arising from such activities and/or such nefarious schemes and activities directed at, which injured, Plaintiff.

Extortion:

92. For the within and/or foregoing reasons, the subject egregious predicate acts, extortion as enumerated herein, evidence Defendants use of same in furtherance of their schemes, enterprise and nefarious and racketeering activities; all of which are predicate acts as defined by RICO and/or are torts under Georgia law.

93. Thus, Defendants are liable to Plaintiff for all damages arising from such activities and/or such nefarious schemes and activities directed at, which injured, Plaintiff.

Stubborn Litigiousness:

94. Despite repeated attempts to resolves these matters, Defendants have repeatedly ignored Plaintiff's pleas for a reasonable resolution and have forced Plaintiff to hire

counsel and file this action; all of which has caused Plaintiff undue bother, inconvenience and trouble as defined by the Georgia within its "Stubbornly Litigious" torts.

95. Therefore, Defendants are liable to Plaintiff of all damages arising frm their stubborn litigiousness, including, but not limited to, attorney fees and costs of litigation.

Combined Federal and State Claim(s):

All previous paragraphs are incorporated herein-below: Plaintiff, by way of further enumerating his specific claims, injuries to his assets and specific monetary damages, offers the following:

Special Damages:

96. Plaintiff claims the following, to-date, special damages:

$ 42,500.00        (MILEAGE AMOUNTS CONVERTED);

$  7,410.00        (CONVERTED TRIP FEES, ETC.); AND,

$  2,500.00        (*PHANTOM* CHARGES CONVERTED).

_____

$ 52,410.00        PARTIAL TOTAL FUNDS CONVERTED; AND,

$ 12,500.00        ATTORNEY FEES AND COSTS TO DATE.

_____

**$ 64,910.00        TOTAL SPECIAL DAMAGES TO DATE**.

Miscellaneous Allegations and/or Claims For Damages:

All previous paragraphs are incorporated herein-below:

97. Defendants, upon information and belief, have illicitly

*Page 30 of 35*

transferred funds and assets between companies and then, finally, to Defendant United 2 Logistics, their alter ego, to hide same from Plaintiff, creditors and the IRS.

98. Defendants, upon information and belief, are now claiming to the DOT, etc., that they only have 16 trucks to DOT when they, in fact, have 50 trucks, at least, under their possession, custody and control.

99. Defendants, upon information and belief, only paid insurance (cargo, trip, umbrella, business, accident, DOT-required, etc) for 8 to 16 trucks they were using in their business(es) and forged the paperwork for the other 34 to 42 trucks they were using and from which they were benefitting.

100. Over and above the aforementioned *Special Damages*, Defendants are liable to Plaintiff for, in part, additional damages, to wit: $170,230.00, at minimum, as follows:

a.   Treble RICO and Punitive damages for theft by deceit and theft by conversion and illegal and illicit fraud for 97 occurrences relating to and/or concerning *mileage funds conversion* ($42,500.00) as outlined herein in an amount, at minimum of $1,000.00 in punitive damages per occurrence or $97,000 plus $126,500 treble RICO damages (sub total of $223,500.00).

b.   Treble RICO and Punitive damages for theft by deceit

and theft by conversion and illegal and illicit fraud for 97 occurrences relating to and/or concerning *inflated trip fees* ($7,410.00) as outlined herein in an amount, at minimum of $1,000.00 in punitive damages per occurrence or $97,000 plus $22,230 treble RICO damages (sub total of $119,230.00).

C.   Treble RICO and Punitive damages for theft by deceit and theft by conversion and illegal and illicit fraud for 44 occurrences relating to and/or concerning *weekly phantom charges* ($2,500.00) as outlined herein in an amount, at minimum of $1,000.00 in punitive damages per occurrence or $44,000 plus $7,500 treble RICO damages (sub total of $51,500.00).

d.   Treble RICO damages for consequential damages (including, in part, attorney fees and costs to date of at least ($12,500.00) and illicit fraud for a minimum of 238 occurrences relating to and/or concerning *Defendants' racketeering activities and schemes* as outlined herein in an amount, at minimum of $1,000.00 in punitive damages per occurrence or $238,000 plus $37,500 treble RICO damages (sub total of $275,500.00).

e.   Thus, Defendants are liable to Plaintiff treble RICO damages of $193,730.00, to date, punitive damages of $476,000.00, at minimum, for a total of at least

$669,230.00 in additional damages.

101. Defendants are liable to Plaintiff for, at a minimum, *Special damages* ($64,910.00), *treble RICO damages* ($193,730.00) and *punitive damages* ($476,000.00) for an aggregate amount of: **SEVEN HUNDRED, THIRTY-FOUR THOUSAND, SIX HUNDRED, FORTY & 00/100ths ($734,640.00) DOLLARS**.

102. The new evidence of Defendants' RICO violations and nefarious/racketeering activities relating to and concerning Cannell Insurance Company is clear evidence of their schemes and long-standing predicate acts and their pattern of such criminal enterprises to injure Plaintiff and many others.

103. Plaintiff reserves the right to amend or supplement his within allegations, claims, damages and prayers for relief as new or better information is obtained through the discovery process or otherwise.

<u>Affidavit, Verification and Certification by Plaintiff</u>:

Plaintiff, under penalty of law and perjury prohibitions to giving false statements, testimony or evidence, certifies that, notwithstanding the fact that some of the verbiage and syntax may be that of Ralph J. Villani, Esq., his counsel, the within and foregoing claims, allegations, conclusions, third-party evidence and/or other relevant facts relating to and concerning, in part, his instant amended complaint and relating to and concerning his claims and prayers for relief, are from his own personal

knowledge and beliefs and are true and correct.

*FURTHER AFFIANT SAYETH NAUGHT.*

This 3rd day of May, 2008.

/s/ *Fadil Delkic*    (as authorized)
FADIL DELKIC, Plaintiff/Affiant

**WHEREFORE,** Plaintiff prays that this case be tried before a jury of twelve and that this Court award him, at a minimum, *Special damages* ($64,910.00), *treble RICO damages* ($193,730.00) and *punitive damages* ($476,000.00) for an aggregate amount of:

**SEVEN HUNDRED, THIRTY-FOUR THOUSAND, SIX HUNDRED, FORTY & 00/100ths ($734,640.00) DOLLARS**(*an amount well above the diversity threshold and which Plaintiff can reasonable prove and/or which this Court and/or a jury can reasonable award*) plus compensatory, consequential and additional punitive damages, reasonable attorney fees and costs of litigation, additional treble RICO damages, stubbornly litigious damages in amounts as awarded by a fair and impartial jury and that this Court award Plaintiff such further and other relief against these Defendants as this Court deems fair, just and/or equitable.

Respectfully submitted,

This 3rd day of May, 2008.

*VILLANI & ASSOCIATES, P.C.*

/s/ Ralph J. Villani
Ralph J. Villani
GA Bar No. 727700

*Page 34 of 35*

2483 Heritage Village
Suite 16-404
Snellville, GA 30078-6140[6]

(TEL)  (770) 985-6773
(FAX)  (770) 979-5190

(E/M)  law2001@bellsouth.net

                              COUNSEL FOR PLAINTIFF

COMBINED CERTIFICATION OF COMPLIANCE AND CERTIFICATE OF SERVICE

     I certify that this *Amended Complaint* has been prepared in

12-point Courier New font and it complies with LR 5.1(B).

     I further certify that I, this day, electronically filed

Plaintiff's *Amended Complaint* with the Clerk of this Court using

the CM/EMF system which will automatically send E-mail

notification of such filing to the following attorney of record:

          Salmeh Fodor, Esq.    *skfodor@mklawllc.com*

     This 3rd day of May, 2008.

                         *VILLANI & ASSOCIATES, P.C.*


                          /s/ Ralph J. Villani
                         Ralph J. Villani
                         GA Bar No. 727700

2483 Heritage Village
Suite 16-404
Snellville, GA 30078-6140

(TEL)  (770) 985-6773
(FAX)  (770) 979-5190

(E/M)  law2001@bellsouth.net

                         COUNSEL FOR PLAINTIFF

_____

     [6] New address for attorney Ralph J. Villani, Plaintiff's counsel

                    *Page 35 of  35*